# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | |
|---|---|
| In re<br><br>**KIRT FRANCISCO SMITH,**<br><br>      **Debtor**<br>_____<br><br>**KIRT FRANCISCO SMITH,**<br><br>      **Plaintiff**<br><br>**v.**<br><br>**UNITED STATES DEPARTMENT OF**<br>  **EDUCATION,**<br><br>      **Defendant** | **Chapter 7**<br>**Case No. 16-10998-FJB**<br><br><br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 16-1079** |

### <u>MEMORANDUM OF DECISION</u>

## I.  INTRODUCTION

By his complaint in this adversary proceeding, chapter 7 debtor Kirt Francisco Smith ("the

Debtor") seeks a determination that his student loan debt to the United States Department of Education

(the "DOE" or the "government") is dischargeable under 11 U.S.C. § 523(a)(8). Under that subsection,

student loan debt is dischargeable only if repayment of the debt would impose an undue hardship on

the debtor and the debtor's dependents. The Debtor seeks an order that his debt is discharged because

its repayment would impose an undue hardship on him and his mother, a dependent. The debt, which

totaled $49,980.01 as of August 17, 2017, was incurred from 2008 through 2010 to fund the Debtor's

pursuit during those years of a degree in computer drafting and design ("CAD") at ITT Technical Institute

("ITT"). It is stipulated that the Debtor was diagnosed with an "intractable juvenile absence seizure

disorder," or epilepsy, at age nine. It is further stipulated that he was diagnosed with depression with

suicidal ideation and panic attacks, attention deficit hyperactivity disorder, executive function difficulties

with sustained, divided and complex attention in both visual and verbal domains (collectively referred to as his "affective disorders"). The Debtor, now thirty-nine years old, has been in almost constant treatment for epilepsy and his affective disorders for 30 years. Upon application of the totality-of-the-circumstances test for determining whether a debtor has established that repayment of student loan debt would impose an undue hardship upon him and his dependents, I determine that the Debtor has met his burden. And, in fact, I would reach the same conclusion even if I were to apply the alternative *Brunner* test.

## II.      JURISDICTION

This adversary proceeding is one to determine the dischargeability of a debt in bankruptcy. The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) (conferring jurisdiction of district courts over all civil proceeding arising under title 11) and the standing order of reference issued by the United States District Court for the District of Massachusetts. L.R. 201 (D. Mass.); 28 U.S.C. § 157(a) (permitting each district court to refer all proceeding arising under title 11 to the bankruptcy judges for the district). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (a proceeding to determine the dischargeability of a particular debt is a core proceeding). Accordingly, under 28 U.S.C. § 157(b)(1), the Court has authority to enter final judgment in the matter. Venue is proper in this district. 28 U.S.C. §§ 1408 and 1409.

## III.      FACTS

Pursuant to Fed. R. Civ. P. 52(a)(1), made applicable by Fed. R. Bankr. P. 7052, the Court now makes the following findings of fact and conclusions of law. Limited additional findings are stated in the Analysis portion of this memorandum.

a.    **Stipulated Facts**

Pursuant to the Court's Scheduling and Pretrial Order, as modified at the joint request of the

parties, the parties filed an Amended Joint Statement of Stipulated Facts.  In that submission the parties

stipulated to the following facts.

The Debtor is a thirty-nine year old man living in Dorchester, Massachusetts (the "Residence").

He has lived for several years at his Residence with his mother, Margarita E. Murrell. The Debtor filed a

petition seeking relief under Chapter 7 of the Bankruptcy Code on March 22, 2016 (the "Petition Date").

The Court entered an order of discharge under 11 U.S.C. § 727. The Debtor filed this adversary

proceeding on May 11, 2016, seeking to discharge his student loans.  He was previously employed in a

paid position, as an Assistant Supervisor with the Stop & Shop Supermarket Company in a warehouse in

Assonet, Massachusetts.  Starting in the summer of 2008, when the Debtor was thirty years old, he

enrolled in ITT for the purpose of obtaining a degree of Associate in Applied Science.  The Debtor

enrolled in the CAD Program, which he completed in June 2010.  He earned the associate's degree at

that time.

The Debtor was diagnosed with an intractable juvenile absence seizure disorder, a form of

epilepsy, at age nine, and he has been treated for this disorder at the Brigham and Women's Hospital

("BWH") in Boston since 2000, after moving with his mother to Boston, Massachusetts.  The Debtor's

epilepsy is treated by medication and by a Vagus Nerve Stimulation device ("the VNS"), which was

inserted in 2005.  As a result of his illness, the Debtor does not have a driver's license.  The Debtor was

also diagnosed with the affective disorders, including depression accompanied by a history of suicidal

ideation and panic attacks. In addition, the Debtor was diagnosed with attention deficit hyperactivity

disorder and executive functioning difficulties with sustained, divided, and complex attention in both

visual and verbal domains. The Debtor is undergoing treatment for his affective disorders by medication

and psychotherapy. The Debtor is scheduled to meet with Ms. Laura Morrissey, LICSW, who is employed

at the BWH, on at least a bi-weekly basis.

The Debtor has received Title II Social Security Disability benefits since July 27, 2007.  In 2007, in

connection with his Social Security Disability review, the Debtor demonstrated a history of intractable

juvenile absence epilepsy and migraine headaches. Further, the Debtor suffered from depression with

passive suicidal ideation, disorganization, poor energy, and difficulties with focus and concentration.

The Debtor financed his ITT education by the following educational loans at the stated annual

interest rates to attend ITT:

| Disbursement Date | Disbursement Amount | Loan Interest Rate |
|---|---|---|
| June 11, 2008 | $3,500 | 6.8% |
| June 11, 2008 | $4,000 | 6.8% |
| July 16, 2008 | $2,000 | 6.8% |
| October 7, 2009 | $1,000 | 5.6% |
| November 25, 2009 | $4,667 | 6.8% |
| November 28, 2009 | $3,667 | 5.6% |
| February 25, 2009 | $3,500 | 6.0% |
| February 25, 2009 | $6,000 | 6.8% |
| October 12, 2011 | $1,834 | 3.4% |
| October 12, 2011 | $2,334 | 6.8% |

**Total**  $29,002

The educational loans are documented by the following master promissory notes:  Direct

Stafford Loans:  (A) Federal Direct Stafford Master Promissory Note William D. Ford Direct Loan, dated

August 16, 2011; and (B) FFEL Loans:  Federal Family Education Loan Program (FFELP) Master Promissory

Note, dated May 12, 2010.  As of August 17, 2017, the Debtor owes the Defendant a total of $49,980.01

for the Student Loan obligations.

The Debtor has never made a payment on his student loans.  He applied for an income based

repayment program with respect to his student loans on June 6, 2014. His application was approved,

and it was determined that he would not have to make any payments between July 5, 2014 and June 5,

2015.  The Debtor is not currently subject to an income based repayment program with respect to his

loans.

As to income and expenses, the parties agree that as of January 2017, the Debtor was receiving

$1,369 each month in Social Security Disability payments. He also receives food stamps but has no other

income and receives no other government benefits.  The Debtor started receiving Social Security

Disability payments on July 27, 2007.

The Debtor lives at the Residence with his mother. He and she incur certain shared expenses.

The lease agreement for the Residence is between his mother and the landlord; the current monthly

rent for the Residence is $1,250.  The average monthly gas bill for the Residence in 2016 was $102.  The

average monthly electricity bill for the Residence in 2016 was $87.  The cable, internet, and landline

(bundled services) for the Residence for the month of July 2017 was $211.71. From December 2014 to

June 2016, the Debtor spent an average of $34.99 per month on a membership to a fitness club called

LA Fitness. He also spends a monthly average of $88.00 on a cell phone plan from MetroPCS; the plan

includes two cell phones, one for himself and one for his mother.

     **b.**     **The Evidence Adduced at Trial**

At the trial the Debtor offered his own testimony, as well as that of his mother, Ms. Murrell, and

his clinical social worker, Ms. Laura Morrissey.  The trial was convened over five days.  The DOE offered

some exhibits by agreement but no live testimony.  I found both the Debtor and his mother credible.

Ms. Morrissey was also credible and offered helpful expert opinions.  She currently sees the Debtor

weekly for treatment and counselling and is highly in tune with his medical and psychiatric deficits.

Among the documents admitted into evidence are many years of medical records of the Debtor.  Also

admitted are the extensive findings of the Social Security Administration dated September 9, 2015, and

the agency's conclusion that he remains eligible for continued disability benefits.

The Debtor was born in Barbados and resided there until he was seventeen years old. As a child he was active and a good student, and he played sports such as cricket and football. At the age of nine, he began to suffer seizures of both the grand mal and petit mal varieties. From that point forward, his mother could not leave him home alone, and he was dependent on her for his care. As noted, when he was a teenager, the Debtor moved to the United States with his mother as soon as she found a doctor to treat him. Her primary reason for moving was to obtain better treatment for him, in particular from Dr. Edward Bromfield at BWH.

After he moved to Boston, the Debtor began working at a series of jobs. He worked for Barnes & Noble at a book warehouse. In this position he was paid minimum wage for packaging and shipping book orders. After a few years at this position, he suffered a fall from a loading dock, resulting in a back injury for which he has received treatment until today. He left that job due to the injury, but also because his boss verbally abused him and made fun of him.

Next the Debtor found employment at a Stop & Shop warehouse. He worked there for five years. His job title changed from utility clerk to assistant manager, but his pay did not increase. Eventually his job location for Stop & Shop changed to Assonet, Massachusetts. He relocated to an apartment nearer to the warehouse and roomed with a co-worker. The rent for the apartment was subsidized by his employer.

The Debtor testified that he was treated poorly by his co-workers and supervisors at the Stop & Shop warehouse. He says that they verbally abused him, but he offered little detail. This treatment led him into depression and eventually caused him to suffer a "nervous breakdown" of unspecified nature. He was hospitalized in 2006 at McLean Hospital in Belmont, Massachusetts for a period of time. He says that he was a danger to himself or others. The Debtor has not been employed since his hospitalization.

The Debtor testified that he sees nine medical professionals on a regular basis. He is seen for his epilepsy and his affective disorders. According to medical records prepared by Dr. Melissa Frumin, a

psychiatrist at BWH who has treated him for many years, the Debtor's primary disability is intractable juvenile absence seizure disorder, or intractable epilepsy. His epilepsy causes two types of seizures: grand mal, which cause him to lose consciousness and to shake uncontrollably, and petit mal, which cause him to lose track of his surroundings for a very brief period.  He has not had grand mal seizures since he had the VNS implanted. His petit mal seizures are treated with medication, but it appears that he still suffers from these seizures several times a day.  In addition, the medications that he takes to address the petit mal seizures cause him side effects such as drowsiness, nausea, depression, and suicidal thoughts.

The Debtor's epilepsy led to his affective disorders.  Those disorders include anxiety and depression leading to suicidal ideation.  After his psychiatric hospitalization, the Debtor attempted to regain normalcy by spending time with his mother's friends from church.  He also has tried a variety of anti-depressant medications, but they have not fully controlled his affective disorders.

Ms. Morrissey, Debtor's clinical social worker, is a magna cum laude graduate of Brown University and has a graduate degree in clinical social work from New York University, where she achieved a 4.0 cumulative grade point average.  She testified that the Debtor frequently reports having suicidal thoughts.  He has told her that he thinks about the specific means of suicide, such as medication overdose and exsanguination.  In fact, at a therapy session after his testimony in this case but before Ms. Morrissey's testimony, the Debtor reported to Ms. Morrissey that after his testimony in court he went to a courthouse rest room and looked for a place to hang himself.  At other points in her testimony, Ms. Morrissey noted that the Debtor had denied having suicidal ideation, or denied that he had considered means.  Her only explanation as to these inconsistencies was that he reacted with suicidal ideation and thoughts of means when under stress or when he perceived a lack of success. She stated that his relief is to go to sleep or to distract himself with video games and television.

As to the prognosis on his depression, anxiety, and affective disorders in general, Ms. Morrissey testified that she was unsure that he would ever overcome his suicidal ideation, such that he could obtain and retain gainful employment. She also noted that perhaps, with intensive therapy, he could overcome these issues, but also that he had not improved over the course of his treatment with her from May 2014 to the present.

Of importance in a case such as this, Ms. Morrissey testified that the Debtor's restrictions in concentration, attention, persistence, and pace negatively impact his executive functioning skills. This means that he has difficulty following multi-step instructions. He is unable to put his thoughts together and has difficulty expressing himself. For example, the Debtor is unable to complete governmental or medical forms without assistance.

As noted above, the Debtor enrolled in a program in computer drafting and design at ITT in 2008. The program lasted two years, and the Debtor did well in his studies. His program required him to attend classes two half days a week. The Debtor testified credibly that his education was impaired by his illnesses. Because of his epilepsy and petit mal seizures, he was required to spend much more time on his studies than expected. He graduated in 2010, with honors, after which he pursued additional course work at ITT in order to enhance his job potential. In 2011, after graduation, the Debtor borrowed an additional $4,000 to attend the additional classes, which is reflected in the student loan chart above.

The Debtor was unable to find a job in his chosen field. He worked with the career services personnel at ITT. He prepared a resume and uploaded it onto several online application portals. Although he attended a few interviews, he never received an offer of employment. Between 2011 and 2015, he obtained one non-paying job in the CAD field, editing drawings for one of his teachers. The Debtor testified credibly, and I find, that his medical and psychiatric conditions have inhibited his ability to seek and obtain employment.

The Debtor and his mother live modestly.  The Debtor receives $1,369 per month in Social

Security Disability Income.  His mother receives $792.26 in Social Security Income, and they receive food

stamps in the amount of $104. Thus, their combined monthly income totals $2,265.26.  They also

receive gifts from family and friends from time to time, but these are not reliable.  The Debtor and his

mother combine their monthly income and expenses.  The mother has access to the Debtor's checking

account, and she withdraws such funds as are needed to make ends meet.

Following are the expenses proven by the Debtor:

| Type of Expense | Average Monthly Expense |
|---|---|
| Rent | $1,250.00 |
| Medications (out-of-pocket) | $40.00 |
| Healthcare (out-of-pocket) | $100.00 |
| Food and Other Household Items | $400.00 |
| Gas | $102.00 |
| Electricity | $87.00 |
| Internet, Phone, Cable | $211.72 |
| Cell Phone | $88.00 |
| Transportation | $70.00 |
| Total: | $2,348.72 |

The Debtor and his mother have tried, unsuccessfully, to reduce their rent expense by applying

for public housing.  They remain on a list for such housing.  Ms. Murrell visits food pantries, church and

other food banks to supplement their food needs with low cost or free food.

The DOE established that the Debtor spends $214.41 per month on entertainment, travel, and

gaming in excess of his internet and television expense of $211 per month. Those expenses include

video and online games (approximately $147), Netflix ($25.65), an Amazon Prime membership ($8.25),

and Hulu ($9.99).  Indeed, the Debtor spends a lot of time on the internet, playing video games, and

watching television.  He claims, and Ms. Morrissey confirms, that these distractions assist him in

addressing his affective disorders.  I find that testimony to be credible, and accordingly I find these

expenses to be reasonable in the circumstances.

The Debtor has not made a payment on his Student Loans.  In 2014 the DOE approved the

Debtor for a one-year income based repayment plan that set his monthly payment at zero.  After that

year the DOE gave the Debtor a notice that he had to renew his application for the program, but he did

not complete the application.  Ms. Morrissey testified that the Debtor lacks the executive functioning to

complete government forms, and she has offered to assist him with these tasks so long as she is treating

him.

The DOE established on cross-examination that the Debtor has some of the attributes needed

for the workplace.  According to Ms. Morrissey and the Debtor, the Debtor has appropriate hygiene and

is punctual.  The Debtor confirmed that he is adept at several aspects of computer aided design and

drafting.  More important, Ms. Morrissey confirmed that having a job might improve the Debtor's self-

worth and expose him to social interaction.  Ms. Morrissey did confirm, however, that although the

Debtor might benefit from a job and might even be able to get a job, he was unlikely to be able to keep

one.

IV.    **The Applicable Law**

Section 523(a)(8) of the Bankruptcy Code provides in pertinent part:

> (a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this
>      title does not discharge an individual debtor from any debt—
>
>  (8) unless excepting such debt from discharge under this paragraph
>      would impose an undue hardship on the debtor and the debtor's
>      dependents, for—
>
>     (A)(i) an educational benefit overpayment or loan made, insured,
>         or guaranteed by a governmental unit, or made under any
>         program funded in whole or in part by a governmental unit or
>         nonprofit institution; or (ii) an obligation to repay funds
>         received as an educational benefit, scholarship, or stipend; or
>
>     (B) any other educational loan that is a qualified education loan, as
>         defined in section 221(d)(1) of the Internal Revenue Code of
>         1986, incurred by a debtor who is an individual[.]

11 U.S.C. § 523(a)(8). The Bankruptcy Code does not define "undue hardship," and the First Circuit Court

of Appeals has not endorsed a test or standard for determining the content of this statutory language.

Nevertheless, in *Nash v. Conn. Student Loan Foundation (In re Nash)*, 446 F.3d 188 (1st Cir. 2006), the

First Circuit observed that debtors have "a formidable task" in establishing undue hardship because

"Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest

debtors a fresh start does not automatically apply to student loan debtors. Rather, the interest in

ensuring the continued viability of the student loan program takes precedence." Id. at 191 (citing *TI Fed.*

*Credit Union v. DelBonis*, 72 F.3d 921, 937 (1st Cir. 1995)); *Ablavsky v. U.S. Dept. of Educ. (In re.*

*Ablavsky)*, 504 B.R. 709, 718 (Bankr. D. Mass. 2014).

        In determining whether a debtor has satisfied the burden in showing undue hardship, courts

differ on the proper test to apply.  The Second Circuit's test, set forth in *Brunner v. New York State*

*Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987) ("the *Brunner* test"), has been adopted by a

majority of the circuits. The *Brunner* test requires a three-part showing: "(1) that the debtor cannot

maintain, based on current income and expenses, a 'minimal' standard of living for herself and her

dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state

of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3)

that the debtor has made good faith efforts to repay the loans." *Brunner*, 831 F.2d at 396.  Other courts,

including this court, have applied the "totality-of-the-circumstances test," developed by the Eighth

Circuit.  Also tripartite, it requires the court to consider "(1) the debtor's past, present, and reasonably

reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable

necessary living expenses; and (3) any other relevant facts and circumstances surrounding each

particular bankruptcy case." *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir.

2003).  The United States Bankruptcy Appellate Panel for the First Circuit applied the totality-of-the-

circumstances test in *Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon)*, 435 B.R. 791, 800 (1st Cir.

BAP 2010). The Bankruptcy Appellate Panel and the majority of bankruptcy courts in this circuit have adopted the totality-of-the-circumstances test because "the *Brunner* test 'test[s] too much'" and because the good faith requirement lacks support in the language of § 523(a)(8). *Bronsdon*, 435 B.R. at 800–01.

The difference between the two tests is the requirement of proof of a good faith effort to repay the student loan, which is required by the *Brunner* test but not by the totality-of-the-circumstances test. Under the totality-of-the-circumstances test, courts may consider participation in one of the available income contingent repayment plans, or ICRPs, as one of several factors. The panel in *Bronsdon*, however, carefully circumscribed the ICRP requirement: "the ICRP may be beneficial for a borrower whose inability to pay is temporary and whose financial situation is expected to improve significantly in the future.  Where no significant improvement is anticipated, however, such programs may be detrimental to the borrower's long-term financial health." *Bronsdon*, 435 B.R. at 802 (citations omitted). I have used the totality-of-the-circumstances test in other cases, the parties have agreed that I should apply it here, and I will do so.

But I pause to observe that both tests for "undue hardship" are flawed.  They are outdated and are no longer true to the statutory language in § 523(a)(8).  When the *Brunner* case was decided, student loans were nondischargeable only for five years after they first came due, and proof of undue hardship was needed only for the discharge to occur earlier than the five-year point. The concern stated in the *Brunner* case was that a debtor might obtain a degree and then immediately seek a discharge without so much as trying for five years.  It is not surprising that courts drew a hard line when it came to proving undue hardship under that statutory regime.

The example of the debtor in the *Brunner* case itself makes the point.  Ms. Brunner filed bankruptcy approximately seven months after receiving her Master's degree and sought to discharge her student loans two months later, when they came due. Like all other debtors at the time, Ms.

Brunner could simply have waited five years before filing for bankruptcy relief, and her student loans

would have been discharged upon that filing. This helps explain why the *Brunner* court and those

following *Brunner* added a "good faith" prong to the test despite the lack of any textual basis for it in §

523(a)(8). See *In re Brunner*, 46 B.R. 752, 755 (S.D. N.Y. 1985) (hereinafter "*Brunner I*") ("good-faith"

requirement carries out the intent of § 523(a)(8) to "forestall students . . . from abusing the bankruptcy

system").

 In order to meet the *Brunner* test, courts have ruled that a student-loan debtor must establish

that she is "totally incapacitated," *In re Randall*, 255 B.R. 570, 577 (Bankr. D. N.D. 2000), that she faces a

"certainty of hopelessness," *id*., or that by the effort to repay, she "strips [herself] of all that makes life

worth living." *In re Courtney*, 79 B.R. 1004, 1010 (Bankr. N.D. Ind. 1987).  These hard-hearted tests have

no place in our bankruptcy system.  These standards flow from the *Brunner I* court's worry about

students abusing the bankruptcy system.  *Brunner I*, 46 B.R. at 755.  But the statutory circumstances that

gave rise to such a test are no longer present and have not been present for many years.

 The totality-of-the-circumstances test, which is the offspring of *Brunner*, also suffers from

significant defects.  Under its first strand the court must consider "the debtor's past, present, and

reasonably reliable future financial resources."  Section 523(a)(8) is firmly and exclusively focused on the

present, it says: a student loan is not discharged "unless excepting such debt from discharge . . . would

impose an undue hardship on the debtor and the debtor's dependents."  Nothing in the statute suggests

that a court should consider the debtor's past resources.  If a debtor has suffered a personal, medical, or

financial loss and cannot hope to pay now or in the reasonably reliable future, that should be enough.

And, as noted, under the final strand of the totality-of-the-circumstances test, a court is free to consider

whether the debtor has sought to participate in an income dependent repayment plan as a measure of

good faith.  That consideration veers close to the *Brunner* consideration of whether the debtor has tried

in good faith to repay the debt. See *Ablavsky v. U.S. Dept. of Ed.*, 504 B.R. at 7.  While the totality-of-the-

circumstances test offers a court more flexibility in determining undue hardship, any test that allows for

the court to determine a student debtor's good or bad faith while living at a subsistence level, virtually

strait-jacketed by circumstance, displaces the focus from where the statute would have it: the hardship.

It also imposes on courts the virtually impossible task of evaluating good or bad faith in debtors whose

range of options is exceedingly limited and includes no realistic hope of repaying their loans to any

appreciable extent.

### V.      Positions of the Parties

#### a.      The Debtor

The Debtor argues that he has met the requirements of the totality-of-the-circumstances test.

He first argues that he lacks any past, present, or reasonably reliable future financial resources to be

able to repay his student loans.  He maintains that he has been unable to obtain gainful employment

since 2006.  He lives entirely on his Social Security Disability income and his mother's Social Security

income with food stamp assistance.

The Debtor asserts that his psychiatric and physical disabilities will foreclose his employment

opportunities for the foreseeable future.  His inability to drive, a consequence of his epilepsy, is a major

limiting factor to obtaining employment.  He also cites to the determination by the Social Security

Administration that his financial resources are unlikely to change because of his disabilities as a basis for

this stark employment prognosis.  The testimony of Ms. Morrissey also supports his assertion that he

will not be able to obtain employment.  She testified that she does not believe that the Debtor can

obtain and maintain gainful employment now or in the foreseeable future.

Second, as to the totality-of-the-circumstances test, the Debtor argues that his necessary living

expenses exceed his income.  He has insufficient income to make any payments on account of his

student loans.  The Debtor's income and his mother's income, together with their food stamp benefits,

fall short of their average monthly necessary expenses.  In response to the government's argument that

14

the video game expenses and other entertainment costs are unnecessary, the Debtor states that these expenses are needed to distract him from his affective disorders, including his suicidal ideation. Debtor argues that even without considering these entertainment expenses, he lacks sufficient net resources to pay anything on his student loans.

Third, the Debtor relies on "other" circumstances unique to his case that prevent him from paying his educational loans. In this regard he points heavily to his dismal medical conditions. He suffers from the lifelong affliction of epilepsy. While his grand mal seizures are controlled by the VNS implant, he continues to suffer many times a day from petit mal seizures that interfere with his executive functioning. And the medications that he takes for his epilepsy increase the intensity of his already existing affective disorders. These disabilities cause him to retreat from daily activities of everyday life. In the end he says that they lead to suicidal thoughts. And Ms. Morrissey, his therapist, opines that they prevent him from obtaining gainful employment.

The Debtor responds to the DOE's arguments that he could work at home in an online job by pointing to Ms. Morrissey's testimony that he lacks executive functioning. She also opines that he has insufficient concentration skills for this kind of work. He points to evidence that he is unable to follow multistep directions, to express himself clearly, to work collaboratively, and to keep appointments. According to Ms. Morrissey these deficiencies make it impossible for him to maintain a job even if he were able to get one.

The Debtor also points out that he has tried, unsuccessfully, to repay the loans. He cites evidence that, with Ms. Morrissey's assistance, he entered an income dependent repayment plan in 2014 and participated for a year, his repayment obligation in that year having been $0, but that he has since been unable to complete the paperwork needed to continue in the loan repayment program from year to year.

15

**b.      The DOE**

The DOE argues that the Debtor has failed to meet any of the strands of the totality-of-the-circumstances test.  Starting with the first part of the test, which focuses on the Debtor's past, present, and reasonably reliable future financial resources to pay the loans, the DOE argues that the Debtor's epilepsy and associative disorders affect his employability only minimally.  As to epilepsy, he no longer has grand mal seizures, and his petit mal seizures are insubstantial, almost impossible to perceive, and had no effect on his ability to testify at the trial.  Thus, epilepsy has almost no effect on his ability to gain and maintain employment.   The government also argues that his associative disorders are improving and thus that the Debtor has not established that his disabilities will continue into the future. And DOE says that Ms. Morrissey's testimony established that he would improve his mental state with a part-time job.

As for the Debtor's current financial circumstances, the DOE argues that even minor cutbacks in his video game and online entertainment spending would make it possible for him to repay the loans. According to the DOE, he could pay at least $100 per month, which is enough to cause him to fail the totality-of-the-circumstances test.  The DOE points out that the Debtor's therapist testified that his mental health would improve, not be hurt by, less indulgence in video games and television.

Finally, the DOE argues that the Debtor failed to establish that he has made a good faith effort to repay his student loans or to fill out the needed forms to enter an income dependent repayment plan.  In fact, the DOE points out, the Debtor has failed to make even a single payment on account of his loans.  Thus, it says, he has failed the totality-of-the-circumstances test on this basis as well.

**VI.      ANALYSIS**

As noted, the Court will apply the totality-of-the-circumstances test to determine whether the Debtor has met the undue hardship standard in § 523(a)(8).  While this test is not wholly satisfactory, the Debtor easily meets it.

(1)    **The First Strand: the debtor's past, present, and reasonably reliable future financial resources.**

The focus of this inquiry is on whether the Debtor has now or may have in the future an ability to pay back his student loans.   The government argues that (a) the Debtor has had jobs at Barnes & Noble and Stop & Shop in warehouses and that he could do that work again; (b) the Debtor could work at home in an online job; (c) that the Debtor's mental and physical disabilities do not interfere with his going to work; and (d) the Debtor has not tried hard enough to find a job that he can perform, which amounts to bad faith.   The evidence, however, does not support these arguments.

The Debtor last worked in a warehouse over ten years ago.   A combination of his worsening affective disorders and poor treatment at the job site, whether real or imagined, caused the Debtor to become suicidal, which in turn resulted in a psychiatric in-patient hospitalization at McLean Hospital. The Debtor's conditions at that time led to his eligibility for SSI disability benefits, which continues to the present.   Ms. Morrissey was clear that the Debtor lacks the ability to work from home without supervision and support.   She testified, and I find, that the Debtor lacks the executive function and time management skills to work from home.   His petit mal seizures are a contributing factor in his inability to perform in any job, but certainly when working from home.   And working from home may well lead to further frustration that leads to additional suicidal ideation.   Finally, the Debtor has sought employment in his field and failed to obtain a paying job.   Indeed, I observed the Debtor and believe that he would like to have a job.   I even take as significant that a job might help the Debtor by offering him socialization and executive functioning enhancement opportunities.   But his inability to drive, his petit mal seizures, and his associative disorders are major barriers to his succeeding in the work force.

The Debtor has not recovered from his disabilities, and they are likely to persist.   Ms. Morrissey testified that the Debtor suffered from suicidal ideation during the trial itself, including a plan as to how to carry out that ideation in the courthouse while on a break.   And as to his prognosis, while her testimony was guarded, Ms. Morrissey testified that "over the course of treatment . . . [the Debtor]

hasn't really shown an improvement."  The Debtor does not deal with failure, stress, and frustration in

normal, healthy ways.  The Debtor testified concerning his psychiatric hospitalization as follows: "I was

strapped to a table, hauled down, needles stuck in me and dragged off in an ambulance to a hospital."

This vivid description of his nervous breakdown ten years ago is powerful evidence that the Debtor has

not recovered from the mental conditions that led to his hospitalization.  It is inescapable that further

stress, frustration, and failure in the workforce is perhaps dangerous in this situation.

On the first strand of the test, I am constrained to conclude, based on his current medical and

psychiatric circumstances and his past failures, that the Debtor's future prospects for employment are

so dim as to be nonexistent.

**(2)**        **The Second Strand: a calculation of the debtor's and his dependent's reasonably
necessary living expenses.**

In this strand of the test the court should consider whether the debtor has an ability to make

payments on his student loans; in short, is there any room in his current budget?  The DOE argues (a)

that the Debtor spends too much money each month on entertainment expenses, especially video

gaming and television; and (b) that the Debtor is subsidizing his mother, who is not a dependent.

The evidence was muddy on what the Debtor spends each month on entertainment.  The DOE

introduced the Debtor's Bank of America checking account statements for calendar year 2016.  In

addition to the Comcast bill for cable television, internet, and telephone of $212.73 per month and cell

phone expense for himself and his mother of $89 per month, the Debtor spent $214 per month on

entertainment, travel, and gaming.  Removing the travel expense (a single important family trip to

Barbados, travel being otherwise rare in the Debtor's life), food expenses, a discontinued gym

membership, a few restaurant charges for food, a discontinued dating website, some minor mailing

expenses, and minor family gifts, the Debtor spent approximately $147 per month in 2016 for video

games.  While that may seem excessive at first blush, Ms. Morrissey, the Debtor, and Ms. Murrell each

testified that use of these games is a distraction and coping mechanism for a man who is otherwise

homebound.  The Debtor testified that he rarely leaves the house for anything other than medical

appointments.  The witnesses testified that the Debtor copes with his illnesses by distracting himself

with television and video games.  Indeed, his psychiatrist, not his social worker, told him to find ways to

cope with his darkest periods.  I found this evidence to be credible and a valid justification for what

otherwise would seem an extravagance.

The Debtor's family budget, shown above, does not balance, with expenses exceeding income

by $83.46.  When one includes the expenses for entertainment shown in the Bank of America checking

account statements, the existing imbalance is exacerbated.  Consequently, according to the Debtor's

mother, as a family they are not current on their household expenses.  For example, in late 2016, after a

prolonged period of larger than normal entertainment expenses, Ms. Murrell testified that their unpaid

gas bill was nearly $1,100, and the electricity bill was also in arrears.  Elimination of the Debtor's gaming

and entertainment expenditures would reduce their total expenses but, as they are already living at a

monthly deficit, this elimination would still not free up funds for debt repayment.

The DOE argues that the Debtor is supporting his mother, who is not a dependent, which

demonstrates that he can afford to pay back his loans.  This argument fails because (a) I determine that

Ms. Murrell is a dependent under the statute; (b) the Debtor is receiving more than fair value from her

in the care that she supplies to him; and (c) the efficiencies they achieve by living together in a single

apartment help make life affordable (albeit barely, or nearly) for him, too.  He would be worse off, too,

financially and in other ways, were they to live separately, each on their respective incomes.

The Debtor and his mother share expenses.  The Debtor makes the physical payments for the

cable bills, two cell phones, and some food and medicines.  His mother cuts the checks for all other

household expenses, including rent, food, and utilities.  The Debtor has allowed his mother access to his

checking account to pay a share of these expenses.  Because the Debtor's income exceeds his mother's

income, the government argues that he is supporting her and that she is not a dependent.

The word "dependent" is not defined in the Bankruptcy Code.  Therefore, the Court should give that word its ordinary and customary meaning.  *Oliviera v. New Prime, Inc.,* 857 F.3d 7, 19 (1st Cir. 2017). I adopt the definition of dependent stated in *Leslie Womack Real Estate, Inc. v. Dunbar (In re Dunbar)*, 99 B.R. 320, 324 (Bankr. M.D. La. 1989), under which dependent means "a person who reasonably relies on the debtor for support and whom the debtor has reason to and does support financially."  Many other courts have adopted this definition of dependent in a variety of contexts.  *See, e.g.*, *In re Justice*, 404 B.R. 506, 516 (Bankr. W D. Ark. 2009).  Ms. Murrell is elderly and disabled. She needs the financial support of her son, and he has reason to support his mother.  As such she meets the *Dunbar* definition of dependent, and the Debtor's student loans can be deemed dischargeable if their repayment would impose an undue hardship on her.   See *Doe v. Educ. Credit Mgmt. Corp. (In re Doe)*, 325 B.R. 69, 75 (E.D.N.Y. 2005) ("Nothing in the Bankruptcy Code or case law suggests that a debtor should be forced to refuse to support a parent who has no other viable means in order to be better able to repay a student loan.")

Moreover, whatever financial support the Debtor is supplying to his mother is not excessive or unwarranted.  There was substantial unrebutted evidence that the Debtor cannot survive without his mother.  She cares for his daily needs of cooking, cleaning, making sure he has and takes his medications, shopping, and making sure he attends medical appointments, and she provides many other life-supportive activities.  If not for his mother, the Debtor would need to arrange for these daily care supports.  Their cost, if it could be determined, would easily exceed the small amount of financial support that the Debtor provides to his mother.

### (3)    The Third Strand: any other relevant facts and circumstances.

The Court may consider any other evidence that it concludes bears on the issue of whether repayment of the student loans is an undue hardship.  In this regard the DOE argues that the Debtor's

failure to continue to participate in an income dependent repayment plan is evidence that the Debtor has not acted in good faith.

The Debtor has made no payments on account of his student loans.  But he has not worked a single day or earned a single dollar since his hospitalization more than ten years ago.   While he attended school after his breakdown, he has not found employment since graduation.  That is attributable to his fragile mental and physical state.  While he did receive approval for an income dependent repayment plan that required no payments, his lack of executive function has impaired his ability to reapply.   A showing of undue hardship does not require that a debtor apply every year for a payment plan that required no payments in the one year that he did apply, when nothing in his profile has changed and nothing is likely to change.  That requirement, imposed going forward, would needlessly interfere with the debtor's fresh start.  This court cannot conclude on this record that the Debtor has acted in bad faith in not attempting repayment or not continuing to participate in an income dependent repayment plan.

There are other factors that further militate in favor of granting a discharge in this case.  The Debtor spends his days in a small bedroom watching television and playing video games, leaving only to visit medical professionals. He takes a number of medications each day that result in some relief but have troubling side effects.  The Debtor has demonstrated a prolonged period of inability to work and to pay on his loans, and he suffers from both a chronic medical condition and a psychiatric condition.  And the Debtor's problems would increase were his caretaker mother no longer able to help him.  Even by the harshest and most demanding standards, this is a case of undue hardship.

**VII.**      **CONCLUSION**

For the reasons set forth above, I conclude that excepting the Debtor's student loan obligations from discharge would impose on him and his dependent mother an undue hardship. Accordingly, judgment shall enter declaring that these obligations are not excepted from discharge.

Date:  April 4, 2018

_____

Frank J. Bailey
United States Bankruptcy Judge